UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 23-195 |
| ROBERT LEE ALLEN | SECTION M |

## ORDER & REASONS

Before the Court is a motion to suppress evidence filed by defendant Robert Lee Allen.[1] The United States of America (the "Government") responds in opposition.[2] The Court held a suppression hearing on July 17, 2025.[3] The government presented the testimony of Detective Richard Hunter of the Terrebonne Parish Sheriff's Office ("TPSO");[4] drone footage of Allen's residence;[5] body-camera footage of a third-party vehicle stop and search;[6] the warrants and supporting affidavits for searches of Allen's residence, his girlfriend's vehicle, and Allen's cellphone;[7] photographs of evidence recovered during the search of Allen's residence;[8] and Hunter's report.[9] Post-hearing memoranda were filed by Allen[10] and the Government[11] per the Court's order.[12] Having considered the parties' memoranda, the record, and the applicable law, the Court denies the motion.

---

[1] R. Doc. 52.
[2] R. Doc. 57.
[3] R. Doc. 58.
[4] *Id.* at 1.
[5] Gov't Exhibit 1.
[6] Gov't Exhibit 2.
[7] R. Doc. 57-1.
[8] Gov't Exhibits 3a, 3b, and 3c.
[9] Gov't Exhibit 4.
[10] R. Doc. 60.
[11] R. Doc. 59.
[12] R. Doc. 58.

## I.    BACKGROUND

On March 20, 2023, an unnamed individual who had been recently arrested for possession of drug paraphernalia told a Houma Police Department ("HPD") agent that she had obtained the paraphernalia from an individual named Robert Lee, also known as "Gimp Arm."[13]    After receiving this information, members of the Louisiana State Police ("LSP"), HPD, and TPSO, including Hunter, began conducting physical surveillance via drone of Allen's residence at 109 Blair Drive in Houma.[14]    Hunter testified that the TPSO was familiar with the location of Allen's residence because its Narcotics Division was already investigating Allen for suspected drug activity at the time.    Hunter also testified that he knew Allen was referred to as "Gimp Arm."

While surveilling Allen's residence using live drone footage, the drone pilot observed a white Chevrolet Colorado pickup truck bearing Louisiana license-plate number X216516 drive up to the residence.    The footage shows Allen leaving the residence shortly after the truck arrived, approaching the truck, and then reentering the residence as the truck drove away.    Although the view of the truck is obscured at the moment Allen met it,[15] Hunter described the interaction as appearing to be consistent with a drug transaction, in light of his training and experience.[16]    The drone operator communicated to Hunter by radio that the truck had departed Allen's residence, and the operator continued to surveil the truck via drone until it reached Grand Caillou Road, at which point Hunter and his partner, TPSO Detective Ryan Trosclair, began following the truck in an unmarked vehicle.    After observing the truck "swerving back and forward from the fog line to

---

[13] *See* R. Docs. 57 at 1; 57-1 at 5, 12, 21, 30.  Hunter testified that he did not speak directly with this individual, but his report indicates that she told the HPD officers who stopped her that "I don't care I'll tell y'all who I get it from," before "follow[ing] up with Robert Lee 'Gimp Arm.'"  Gov't Exhibit 4 at 1.
[14] *See* R. Docs. 57 at 1; 57-1 at 5, 12, 21, 30; Gov't Exhibit 1.
[15] *See* Gov't Exhibit 1.
[16] *See* R. Doc. 57-1 at 5, 12, 21, 30.

the center lane of travel," as if operated by "an impaired driver," Hunter and Trosclair conducted a traffic stop of the truck.[17]

Hunter testified that, as he approached the truck, he saw the front-seat passenger, Dennis Dardar, "squirming" in his seat and "lifting his butt area up" in a way that led Hunter to suspect that he was "attempting to conceal something on his person." Hunter informed the driver, Kenneth DuBois, that he had pulled him over because he was swerving. DuBois told Hunter that he was swerving because he was still getting used to new tires recently installed on the truck, but Hunter testified that he smelled the odor of marijuana and alcohol coming from the truck and observed an open container in the front console cupholder, which Dardar claimed was his.[18] Hunter described Dardar as appearing to be very nervous and evasive in response to his questions. Hunter advised DuBois and Dardar of their *Miranda* rights, which both of them indicated they understood, and asked Dardar to exit the truck. While performing a protective frisk of Dardar, and after obtaining Dardar's permission to empty his pockets, Hunter removed a small cellophane bag that was protruding from Dardar's pocket containing what appeared to be marijuana. He then handcuffed Dardar and searched the interior of the truck.[19] While Hunter was in his vehicle completing paperwork related to the stop, another detective recovered approximately three grams of suspected heroin and/or fentanyl from Dardar's left sock.[20] Dardar told the detective that he had obtained the drugs from an individual known as "Fat Ass." When asked to elaborate, Dardar said that "he live[s] on Blair Drive back there," and that "he is fat and have a [g]imp [a]rm."[21]

---

[17] *Id.* at 5, 12, 21, 30.

[18] *Id.* at 12, 21, 30; Gov't Exhibit 2.

[19] *Id.* at 6, 13, 22, 31; Gov't Exhibit 2. Hunter testified that he searched the truck because he had observed the smell of marijuana in the truck when speaking with DuBois and Dardar through the driver's side window. Nothing of evidentiary value was recovered from the truck.

[20] Hunter testified that the drugs recovered from Dardar were sent to the LSP crime lab for testing and were confirmed to contain heroin and fentanyl.

[21] R. Doc. 57-1 at 6, 13, 22, 31. This conversation was not captured by body-camera footage.

After the traffic stop, Hunter prepared a search warrant application for Allen's residence. The affidavit described the information provided to HPD by the unnamed individual earlier that day, that DuBois and Dardar were observed visiting Allen's residence in the truck before they were pulled over, and the events of the traffic stop, including the recovery of the heroin and fentanyl from Dardar's person and his description of the individual who sold it to him. It also noted that "Robert Lee Allen 'Aka' Gimp Arm is a convicted felon and has several illegal narcotics case(s) pending [and] is current[ly] out on bond pending the outcome of his open[] narcotics case(s)."[22] A search warrant was issued by Judge Juan Pickett of the 32nd Judicial District Court for Terrebonne Parish, Louisiana, at 8:01 p.m. on March 20, 2023, and was executed that night.[23] The search of Allen's residence resulted in the recovery of, *inter alia*, 383 grams of suspected heroin and/or fentanyl, a marijuana cigar, drug paraphernalia, and the key to a Hyundai vehicle.[24] Officers obtained an arrest warrant for Allen following the search of his residence.[25]

Hunter explained that, after the arrest warrant was signed by Judge Pickett, the TPSO began looking for Allen. Allen was known to drive a blue Hyundai Sonata bearing Louisiana license-plate number 427EQP that belonged to his girlfriend, Bridget Ray, who resided with him at 109 Blair Drive. The Hyundai was parked at the residence when the white pickup truck was seen there on March 20, 2023, but was relocated before the execution of the search warrant for the residence that night.[26] The next day, officers observed the Hyundai traveling on Grand Caillou Road and initiated a traffic stop. Hunter met the officers at the traffic stop to interview the driver, Sedria Chambers, and her passenger, Keshon Robinson. Hunter smelled a strong odor of marijuana and

---

[22] R. Doc. 57-1 at 3-6.
[23] *Id.* at 1-2.
[24] R. Docs. 57 at 3; 57-1 at 13, 22, 31-32; Gov't Exhibits 3a, 3b, 3c.
[25] R. Doc. 57 at 3.
[26] Gov't Exhibit 1; R. Doc. 57-1 at 32.

asked Chambers to exit the vehicle.   Chambers denied having any knowledge of Allen's whereabouts and told Hunter that she was asked to bring the vehicle to Ray's mother's house. After Hunter explained to Chambers that she would be brought in for questioning, she told him that Robinson was in possession of a marijuana cigar belonging to her, which Hunter recovered from Robinson.  The Hyundai was towed to the TPSO crime lab where it remained locked pending the issuance of a search warrant.[27]   Hunter prepared an application for a search warrant for the vehicle.  His affidavit contained the same information as the affidavit he submitted for the search warrant for Allen's residence, plus a description of Allen's connection to the vehicle and the events of the March 21, 2023 traffic stop.[28]   The warrant was signed by Judge Pickett on March 22, 2025.[29]

During the search of the Hyundai, a Verizon flip phone was found between the passenger seat and center console.  Hunter suspected that it was placed there to conceal it and that it might contain evidence of illegal drug transactions based on his experience as a narcotics detective.  He applied for a search warrant for the phone, including in his affidavit the same information as set out in the vehicle affidavit, the results of the vehicle search, and his suspicion that the phone may contain evidence of illegal drug transactions.[30]   A warrant was issued by Judge Pickett on March 23, 2023.[31]   Hunter reviewed the phone's contents and found messages relating to drug transactions.  He then gave the phone to another detective to download its data.  However, repeated attempts to download the data were unsuccessful and the warrant expired before any data was obtained.[32]   Consequently, Hunter applied for a second cellphone search warrant, including the

---

[27] R. Doc. 57-1 at 14.
[28] *Id.* at 10-14.
[29] *Id.* at 15.
[30] *Id.* at 19-24.
[31] *Id.* at 24.
[32] *Id.* at 33.

same information as contained in the first cellphone affidavit, a description of the messages he found, and an explanation of the TPSO's failed attempts to download the data.[33]  A second cellphone search warrant was issued by Judge Jason Dagate of the 32nd Judicial District Court on May 9, 2023,[34] and the data was thereafter manually extracted.

Allen was eventually arrested in connection with this investigation and, on September 7, 2023, was named in an indictment in this Court charging him with one count of possessing with intent to distribute 40 grams or more of fentanyl and 100 grams or more of heroin.[35]  He now seeks to suppress all of the evidence obtained as a result of the traffic stop involving DuBois and Dardar and the searches of his residence, Ray's vehicle, and his cellphone.

## II.    LAW & ANALYSIS

### A.  Legal Standard

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022).   "'The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'"  *United States v. Garcia*, 99 F.4th 253, 267 (5th Cir. 2024) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)).  To meet this burden, the movant must first establish that a search has occurred.  Then, "'if a search has in fact occurred, the movant must show that the government intrusion was unreasonable given

---

[33] *Id.* at 28-34.
[34] *Id.* at 34.
[35] R. Doc. 1.

6

the particular facts of the case.'" *Id.* (alteration omitted) (quoting *Smith*, 978 F.2d at 176). "Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions." *Alvarez*, 40 F.4th at 345. Thus, when a warrantless search or seizure is at issue, the burden shifts to the government to show that an exception applies. *Id.*

Where a search was conducted pursuant to a warrant, "[t]he exclusionary rule requires courts to suppress evidence seized on the basis of a warrant that is unsupported by probable cause." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). "The information necessary to show probable cause must be contained within a written affidavit given under oath." *United States v. McDaniel*, 293 F. App'x 265, 268 (5th Cir. 2008). Probable cause exists where the affidavit provides "a substantial basis for concluding that a search would uncover evidence of wrongdoing," and "[a] magistrate's determination is entitled to deference by reviewing courts." *Id.* However, "[t]he Supreme Court has held that 'evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant is admissible, even though the warrant was unsupported by probable cause.'" *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006) (quoting *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993)). The good-faith exception was created because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates," *United States v. Leon*, 468 U.S. 897, 916 (1984), and, where an officer reasonably relies in good faith on a search warrant, "there is no police illegality and thus nothing to deter." *Id.* at 921. Under this exception, an officer's good-faith reliance on a search warrant will suffice regardless of whether the warrant was supported by probable cause unless:

> (1) the issuing-judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing-judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the underlying affidavit is "bare bones" ("so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"); or (4) the warrant is

"so facially deficient ... that the executing officers cannot reasonably presume it to be valid."

*United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

## B. Analysis

### 1. Warrantless Traffic Stop and Search of Third Parties

Allen first challenges the legality of the traffic stop involving DuBois and Dardar, which resulted in the discovery of fentanyl and/or heroin on Dardar's person, and Dardar's subsequent admission that he had obtained the drugs from an individual who, based on Dardar's description, officers believed to be Allen.[36] Allen argues that Hunter and Trosclair's decision to stop the pickup truck "was not supported by any facts rising to reasonable suspicion," and that they instead "manufactured a pretext to detain [DuBois and Dardar], absent any observed violation."[37] Allen further contends that, "even if the initial stop had some minimal justification," the subsequent warrantless search of the truck "exceeded any permissible scope," and the pat-down of Dardar was conducted "without consent, without a search warrant, and without any exigent circumstances."[38] "Because the traffic stop was unlawfully initiated and the ensuing vehicle search was unlawful," says Allen, "any evidence obtained directly, including the narcotics seized from [Dardar] and any information or statements gleaned from [him], is 'fruit of the poisonous tree' and must be suppressed."[39]

The Government argues that Allen must establish that his own Fourth Amendment rights, not those of a third party, were violated by the traffic stop to suppress the evidence obtained during

---

[36] R. Docs. 52 at 6; 60 at 3.
[37] R. Doc. 52 at 7 (emphasis omitted); *see also* R. Doc. 60 at 3.
[38] R. Doc. 52 at 7 (emphasis omitted).
[39] *Id.* at 8 (emphasis omitted).

it.[40]  Because he "was neither a driver nor passenger in the white pickup truck," the Government contends that Allen "has failed to show a legitimate expectation of privacy as it pertains to the traffic stop and the white pickup truck" and his motion to suppress evidence obtained during the traffic stop must therefore fail.[41]  The Government further argues that, even if Allen had a privacy interest in the traffic stop, the traffic stop and ensuing searches were valid.[42]  It contends that Hunter and Trosclair's observation of the truck swerving between the fog lane and center lane of travel, along with the surveillance footage of the truck stopping at Allen's residence and the officer's detection of the odor of alcohol and marijuana in the truck, "establish the specific, articulable facts needed to justify the stop and the detention of the occupants of the vehicle."[43]

As the Government points out,[44] "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman v. United States*, 394 U.S. 165, 171-72 (1969).  "Whether a warrant is required is a separate question from … whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'  Answering that question requires examination of whether the person claiming the constitutional violation had a 'legitimate expectation of privacy in the premises' searched."  *Byrd v. United States*, 584 U.S. 395, 403 (2018) (internal citation omitted) (quoting *Rakas,* 439 U.S. at 133, 143).  Allen claims no expectation of privacy in the premises searched during the traffic stop – here, the pickup truck and Dardar's person – nor could he.  Thus, he has no "Fourth Amendment standing" to suppress

---

[40] R. Docs. 57 at 4 (citing *Rakas v. Illinois*, 439 U.S. 128, 130 (1978)); 59 at 1-2 (citing *United States v. Salvucci*, 448 U.S. 83, 85 (1980); *United States v. Padilla*, 508 U.S. 77, 81 (1993)).
[41] R. Doc. 57 at 4; *see also* R. Doc. 59 at 1-2 (discussing *United States v. DeLeon*, 641 F.2d 330, 337 (5th Cir. 1981)).
[42] R. Docs. 57 at 4-5; 59 at 2-3.
[43] R. Doc. 57 at 5; *see also* R. Doc. 59 at 2-4.
[44] *See* R. Docs. 52 at 5; 59 at 1-2.

the fruits of the traffic stop.  *Id.* at 410-11 ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search …. Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question …." (internal citation omitted)).  In any event, as shown below, the traffic stop was constitutional.

"The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citing *Terry*, 392 U.S. 1 (1968)).  That framework requires courts to "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."  *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (footnote omitted).  In conducting a reasonable suspicion analysis, courts "'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'"  *Lopez-Moreno*, 420 F.3d at 430 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure."  *Id.*  When weighing the totality of the circumstances, "a court may not consider the relevant factors in isolation from each other."  *Id.* (citing *Arvizu*, 534 U.S. at 274); *see also United States v. Jacquinot*, 258 F.3d 423, 427-28 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total." (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000))).

Here, Hunter observed the truck swerving between the fog lane and center lane of travel. This alone was sufficient to give rise to "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or [was] about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430; *see, e.g., United States v. Grace*, 2024 WL 3497846, at *2 (E.D. La. July 19, 2024) (finding that police officer's observation of defendant "dr[iving] 'in the left lane for an extended period of time,' [and] swerving, which constitutes an 'improper lane use' violation," created reasonable suspicion justifying traffic stop). Moreover, under the totality of the circumstances – including the officers' knowledge of Allen's prior drug charges, the tip received from the unnamed individual on March 20, 2023, and their having just observed Allen's interaction with the truck's occupants, which, in light of their training and experience, appeared to the officers to be an illegal drug transaction – Hunter was further justified in stopping the truck, as he had an objectively reasonable basis to suspect that the driver was impaired. In his report and search warrant affidavits[45] and in his testimony at the suppression hearing, Hunter identified each of these "specific and articulable facts" and the inferences he drew from them. *Lopez-Moreno*, 420 F.3d at 430. Thus, the traffic stop was justified from its inception.

The officers' actions during the traffic stop were also justified in light of the purpose and circumstances of the stop.

> As for the second prong of the *Terry* inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. An officer may also ask the driver about the purpose and itinerary of his trip. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since 'detention, not questioning, is the evil at which *Terry*'s second prong is aimed.' … [I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.

---

[45] *See* Gov't Exhibit 4 at 1; R. Doc. 57-1 at 5, 12, 21, 30.

*Id.* at 430-31 (alterations and internal citations omitted) (quoting *United States v. Brigham,* 382 F.3d 500, 507-08 (5th Cir. 2004)).  Upon stopping DuBois and Dardar, Hunter asked the men for identification and inquired "about the purpose and itinerary of [their] trip."  *Id.*  He asked DuBois whether he had consumed any alcohol and explained that DuBois appeared to be driving as if he were impaired.  DuBois denied having consumed alcohol, but the men admitted that there was an open alcoholic beverage in the center console.  Hunter then told Dardar that he saw him squirming in his seat as he approached the truck and that he intended to search him.  Hunter *Mirandized* the men before proceeding, and they indicated that they understood their rights and were willing to continue speaking with Hunter.  Hunter asked Dardar to exit the vehicle and performed a protective pat-down.  While frisking Dardar, Hunter observed the cellophane bag protruding from his pocket and obtained Dardar's permission to empty his pockets.  After removing the bag, containing what appeared to be marijuana, Hunter handcuffed Dardar, who then admitted that he had "forgot[ten] that he] had some weed in [his] pocket."[46]

The foregoing events all transpired in fewer than ten minutes.[47]  This is a reasonable duration to accomplish the purpose of a traffic stop.  *See United States v. Thomas*, 997 F.3d 603, 615 (5th Cir. 2021) ("As to the length of the detention, apparently about ten minutes, *Terry* stops of that length are permissible." (citing *United States v. Abdo*, 733 F.3d 562, 566 (5th Cir. 2013) (holding that a 15-minute detention was reasonable); *United States v. Campbell*, 178 F.3d 345, 350 (5th Cir. 1999) (holding that detention lasting ten to 25 minutes was "not an unreasonable amount of time under the circumstances")).  Moreover, almost immediately after initiating the stop, Hunter amassed further suspicion of illegal activity.  As Hunter approached the vehicle, he saw Dardar

---

[46] Gov't Exhibit 2.

[47] *Id.*  Hunter discovered the marijuana and handcuffed Dardar approximately seven minutes after initiating the stop.

squirming in his seat, as if to conceal something. He described Dardar's behavior throughout the encounter as nervous and evasive. He also reported smelling marijuana in the truck – which alone created probable cause to search the entire vehicle. *See Terrell v. Town of Woodworth*, 2024 WL 667690, at *9 (5th Cir. Feb. 19, 2024) ("[A]s this court's well-established precedent provides, an officer's detection of the odor of marijuana coming from a vehicle is sufficient to support probable cause to search the vehicle, regardless of whether marijuana is ever found."). Thus, even if Allen had any cognizable Fourth Amendment interest in the truck, there was no Fourth Amendment violation that would warrant suppression of the evidence obtained during the traffic stop.

In his post-hearing memorandum, Allen also asserts that Hunter "questioned the truck's occupants and elicited incriminating statements before giving any *Miranda* warnings, then belatedly Mirandized them and had them repeat their statements, a textbook violation of *Missouri v. Seibert*."[48] However, like the Fourth Amendment's protection against unreasonable searches and seizures, "the Fifth Amendment's protection against self-incrimination is purely personal and may not be asserted on behalf of a third party." *Muscolino v. Landrum*, 310 F. App'x 676, 678 (5th Cir. 2009) (citing *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 55 (1974) ("[A] party incriminated by evidence produced by a third party sustains no violation of his own Fifth Amendment rights.")); *see also Rakas*, 439 U.S. at 140 n.8 (noting that treating Fourth Amendment rights as personal in nature "is consonant with that which the Court already has taken with respect to the Fifth Amendment privilege against self-incrimination, which also is a purely personal right"). And, regardless, Allen has again failed to demonstrate a constitutional violation warranting suppression on this basis.

---

[48] R. Doc. 60 at 2 (emphasis omitted) (citing *Missouri v. Seibert*, 542 U.S. 600, 609-10 (2004) (holding that a "two-stage interrogation" tactic which involved "withholding *Miranda* warnings until after interrogating and drawing out a confession" was unconstitutional)).

13

"'*Miranda* warnings must be administered prior to custodial interrogation.' … Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment. It is well-established that ordinary traffic stops do not place a person 'in custody' for purposes of *Miranda*." *United States v. Coleman*, 610 F. App'x 347, 353 (5th Cir. 2015) (internal citations and quotation marks omitted) (quoting *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988)). Allen does not specify the pre-warning questions or statements he claims violate *Seibert*, but the body-camera footage reveals that the only questioning that took place before DuBois and Dardar were *Mirandized* and could have elicited "incriminating" responses from them were Hunter's inquiries as to whether there were "any weapons in the truck," whether DuBois had had "anything to drink" that day, the contents of the cup in the center console, whether there was "anything illegal inside the vehicle" or on their persons, and whether they had ever been arrested before or had any outstanding warrants.[49] As in *Coleman*, the questioning here "was conducted on the side of a public roadway, where a traffic stop is normally conducted; [Hunter] never engaged [DuBois and Dardar] in specific, lengthy or accusatory questioning about any suspected offense; and [DuBois and Dardar were] sitting in [the truck], unrestrained" up to the point when Hunter *Mirandized* them. *Id.* Thus, no unwarned custodial questioning occurred during the traffic stop. *See id.* (holding that the defendant "was not 'in custody' for purposes of *Miranda* when he made any of the challenged statements" because "the surrounding circumstances and degree of restraint never meaningfully advanced beyond what is typical during an ordinary traffic stop"). Allen's reliance on *Seibert* is entirely inapposite. *Cf. Seibert*, 542 U.S. at 616 ("The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little,

---

[49] Gov't Exhibit 2.

if anything, of incriminating potential left unsaid."). Thus, even if Allen could suppress evidence that was obtained in violation of a third party's Fifth Amendment rights, no such violation occurred.

### 2. Residence Search Warrant

Allen next argues that the evidence seized during the search of his residence must be suppressed because the search warrant was based "almost entirely on the tainted fruits of the prior illegal stop and … the information presented to the magistrate was stale, conclusory, and lacking a factual nexus between the alleged criminal activity and Mr. Allen's home."[50] He contends that the only nexus between the residence and suspected drug activity was Dardar's "uncorroborated allegation" that he had obtained the heroin and/or fentanyl from Allen and the officers' "conclusory assumption" that "because [Dardar] said Allen supplied the drugs and Allen lives at 109 Blair, then the drugs must be at 109 Blair."[51] Allen further argues that the information in the affidavit was stale because it "did not specify a timeframe with any precision" and "described a single drug transaction (an isolated incident) and sought highly portable, consumable items (drugs, money, records) that could easily be moved or destroyed."[52] Allen also attacks the reliability of the information provided by Dardar because it "was obtained under highly questionable circumstances – namely, immediately after he was caught during an illegal vehicle search while he was in custody and hoping to curry favor."[53] Allen then contends that Hunter's affidavit "appears to have contained material misrepresentations and omissions,"[54] including the failure to disclose that

---

[50] R. Doc. 52 at 9-10 (emphasis omitted).

[51] *Id.* at 10-11 (emphasis omitted).

[52] *Id.* at 12 (emphasis omitted).

[53] *Id.* at 13.

[54] *Id.* at 14. Allen requests a *Franks* hearing based on this allegation. *Id.* at 14-16 (discussing *Franks v. Delaware*, 438 U.S. 154, 155 (1978) (holding that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request")). Each of the challenged affidavits in this case

DuBois and Dardar were "stopped and searched without any lawful basis."[55]  Allen asserts that "[t]his omission was almost certainly intentional or, at best, reckless – a trained narcotics officer would understand the circumstances of obtaining an informant's tip should be disclosed, especially if unusual or legally problematic."[56]  Allen also argues that Hunter "may have mischaracterized [Dardar]'s information as more reliable or immediate than it was," thereby "effectively conceal[ing] a material fact about credibility."[57]  Allen next contends that the good-faith exception is inapplicable to the search of Allen's residence because the magistrate (the state judge) was misled by the purported omissions and misrepresentations in the affidavit and because "the affidavit in this case was so bare-bones and conclusory that no well-trained officer could have reasonably believed it established probable cause."[58]  Based on the foregoing arguments, Allen asserts that the evidence recovered from Allen's residence amounts to "the tainted fruits of the unlawful warrant" which "must be suppressed under the exclusionary rule."[59]  He further argues that, because "the evidence from the house search was subsequently used to obtain … the warrant for Mr. Allen's vehicle and his cell phone data," the products of those subsequent searches must be suppressed as "fruit-of-the-fruit."[60]

The Government contends that the search-warrant application for Allen's residence contains sufficient information to support a finding of probable cause, including the information provided to HPD by the unnamed individual on March 20, 2023, Allen's interactions with the

---

was prepared by Hunter, who was called as a witness at the suppression hearing, and Allen was permitted to put on countervailing evidence at the hearing.

[55] *Id.* at 14 (emphasis omitted). *See also* R. Doc. 60 at 3.

[56] R. Doc. 52 at 15 (emphasis omitted).

[57] *Id.* (emphasis omitted); *see also* R. Doc. 60 at 4 ("The affiant presented these individuals as credible sources implicating Mr. Allen, but omitted the crucial context that each informant was a recently arrested suspect hoping for leniency in exchange for cooperation.").

[58] R. Doc. 52 at 17.

[59] *Id.* at 19 (emphasis omitted).

[60] *Id.* (emphasis omitted).

occupants of the pickup truck observed by officers during their surveillance of Allen's residence, and the evidence and information obtained during the traffic stop.[61]   The Government denies that the information in the affidavit was stale, as the officers applied for the search warrant on the same day that the listed events occurred.[62]   It argues that the "unbroken chain of events" described in the affidavit "establish a nexus between the home and the illegal activity."[63]   As to Dardar's reliability, the Government argues that "[c]ourts have generally acknowledged that 'face to face' tips tend to be more reliable" and "reliability may be demonstrated by 'an admission against penal interest.'"[64]   The Government further argues that, even if the search warrant for Allen's residence was defective, it was executed in good faith and Allen's motion to suppress the evidence recovered from his residence must therefore be denied under the good-faith exception.[65]   The Government also argues that Allen fails to make a threshold showing of a *Franks* violation.[66]

Hunter's affidavit, upon which the search warrant for Allen's residence was based, provided "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *McDaniel*, 293 F. App'x at 268.   As to Allen's first argument, *i.e.,* that the warrant failed to include a nexus between Allen's residence and evidence of drug crimes, the affidavit described the drone surveillance footage of Allen's residence and the officers' belief that the interaction between Allen and the occupants of the pickup truck was a drug transaction.[67]   It also recounted the events of the traffic stop which took place shortly after the truck left Allen's residence, including Dardar's admission that he had obtained the heroin and/or fentanyl recovered from his sock from an

---

[61] R. Docs. 57 at 5-6; 59 at 5-6.
[62] R. Doc. 57 at 6.
[63] *Id.*
[64] *Id.* (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).
[65] *Id.* at 6-7.
[66] R. Docs. 57 at 7-8; 59 at 4-5.
[67] R. Doc. 57-1 at 5.

individual meeting Allen's description who "live[d] on Blair Drive."[68]  The affidavit also included

the unnamed individual's statement that she got drug paraphernalia from Allen and that Allen

"ha[d] several illegal narcotics case(s) pending."[69]  Thus, the affidavit provides ample facts tending

to show that Allen sold drugs out of his residence, and, at the very least, that the proceeds of the

sale to Dardar on March 20, 2023, would likely still be in the residence.[70]  *Cf. United States v.*

*Norman*, 129 F.4th 874, 877 (5th Cir. 2025) ("[The defendant] presumably had the proceeds from

the drug transaction with him at the house that night.  Thus, it was reasonable to infer that those

proceeds were likely in the house or its garage.").  Allen's argument that the information in the

affidavit was stale because it "described a single drug transaction (an isolated incident) and sought

highly portable, consumable items (drugs, money, records) that could easily be moved or

destroyed"[71] also must fail, as the "single drug transaction" described in the affidavit occurred the

same day that the warrant was requested, issued, and executed.[72]

Allen's assertion that the affidavit was invalid because it omits certain material facts is

disproven by the affidavit.  Allen asserts that Hunter "intentional[ly] or, at best, reckless[ly]" failed

to disclose that the truck "was stopped and searched without any lawful basis."[73]  To the contrary,

the affidavit states that the officers "observed the [truck]'s driver swerving back and forward from

the fog line to the center lane of travel, which was [consistent with] that of an impaired driver."[74]

---

[68] *Id.* at 6.

[69] *Id.* at 5-6.

[70] While it is unclear whether Dardar stated that the drugs recovered from his sock were purchased that day or on a separate occasion, *id.*, the affidavit for the vehicle search warrant indicates that the vehicle "was present [at Allen's residence] *when Robert Lee Allen distributed a schedule I controlled dangerous substance, suspected heroin/fentanyl*," but departed while the March 20, 2023 search warrant for the residence was being prepared, *id.* at 32 (emphasis added), indicating that the transaction described by Dardar and the exchange observed by officers on March 20, 2023, were one and the same.

[71] R. Doc. 52 at 12.

[72] *See supra* note 70.

[73] R. Doc. 52 at 14-15 (emphasis omitted); *see also* R. Doc. 60 at 3.

[74] R. Doc. 57-1 at 5.  While there is no video footage of the truck swerving, the conversation between Hunter and DuBois regarding the purpose of the traffic stop, in which DuBois admits that he was swerving but asserts that it was because he installed new tires on his truck, corroborates the officers' observation.  Gov't Exhibit 2.

Allen also asserts that the affidavit failed to disclose the fact that the unnamed female informant was in police custody when she implicated Allen[75] and "likely presented [Dardar] as a 'concerned citizen' or a reliable informant or failed to mention how the police came to speak with him."[76] These claims are also belied by the affidavit, which indicates that the unidentified informant made the unprompted statement that she obtained the paraphernalia from Allen after it was found on her person by HPD officers[77] and describes the circumstances surrounding Dardar's statement indicating that he obtained the heroin and/or fentanyl from Allen, including that it was made after Hunter recovered the marijuana from Dardar while patting him down during the traffic stop.[78]

In his post-hearing memorandum, Allen asserts that Hunter also misled the issuing judge by "aver[ing] that officers observed a hand-to-hand drug transaction at 109 Blair Drive through physical surveillance" even though "[t]he drone footage did not capture any actual hand-to-hand exchange."[79] The affidavit describes the interaction as follows: "Robert Lee Allen … exited his residence[] and approached the white pickup. Robert Lee Allen walked up to the white pickup truck and exchanged an[] unknown item with the passenger. *With the narcotics investigators['] training and experience, it appeared a drug transaction was conducted*."[80] While the drone footage does not capture any items exchanging hands, as the truck and all but Allen's head are obscured by a building at the moment Allen would have arrived at the truck's passenger side,[81] Hunter testified that he and the drone operator (who was describing the live footage to Hunter via radio) believed that Allen handed "something" to the passenger, because he could be seen reaching for his right pocket as he walked toward the truck, and that they believed that drugs were

---

[75] R. Doc. 60 at 4.
[76] R. Doc. 52 at 15 (emphasis omitted); *see also* R. Doc. 60 at 4.
[77] R. Doc. 57-1 at 5.
[78] *Id.* at 5-6.
[79] R. Doc. 60 at 2 (emphasis omitted).
[80] R. Doc. 57-1 at 5 (emphasis added).
[81] Gov't Exhibit 1.

exchanged given the brevity of the interaction, which, in their training and experience, "is common with the illegal use of narcotics."  To consider whether probable cause exists, courts

> must take into account the experience of the agents.  "Conduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer."  "*Police officers need not personally observe overt criminal activity to have probable cause*.  The observation of unusual activity for which there is not legitimate, logical explanation can be the basis for probable cause."

*United States v. Woolery*, 670 F.2d 513, 515 (5th Cir. 1982) (internal citations omitted; emphasis added) (first quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), then quoting *United States v. Alexander*, 559 F.2d 1339, 1343 (5th Cir. 1977)).  Aside from pointing out that the suspected hand-to-hand transaction between Allen and the occupants of the truck was not visible from the drone footage, Allen has not provided any other support showing that Hunter's statement – that "it *appeared* [to the officers that] a drug transaction was conducted"[82] – was "a false statement [made] knowingly and intentionally, or with reckless disregard for the truth."  *Franks*, 438 U.S. at 155.  While Hunter did not specify what was or was not visible in the drone footage, he explained that the officers' belief that Allen was exchanging drugs with the truck's occupants was based on their training and experience, indicating a lack of certainty regarding the nature and purpose of the interaction, which the issuing judge could have taken into account in making his probable-cause determination.

In any event, to the extent that the description of the suspected hand-off was an intentional or reckless misrepresentation, it was not "necessary to the finding of probable cause," *id.* at 156, as the affidavit also includes Dardar's statement indicating that he had obtained the heroin and/or fentanyl from Allen, which not only confirms the officers' suspicions that they had observed a drug deal, but was likely sufficient – especially in light of the other information in the affidavit

---

[82] R. Doc. 57-1 at 5 (emphasis added).

linking Allen to drug trafficking – to support a finding of probable cause that narcotics would be found at Allen's residence. Thus, because the affidavit was not "bare bones" nor misleading, and the search warrant was not facially deficient, and there is no indication that the issuing judge "wholly abandoned his judicial role," the evidence recovered during the search of Allen's residence is admissible under the good-faith exception at a minimum. *Gibbs*, 421 F.3d at 358.

### 3. Vehicle Search Warrant

Allen also attacks the constitutionality of the search of Ray's Hyundai. He asserts that the warrant for the vehicle search "suffers from two fatal flaws," the first being that "it was wholly derivative of the prior unlawful searches" and, second, that it "lacked a substantial basis for probable cause even on its own terms."[83] "[I]f the house search was unconstitutional," says Allen, the facts relating to the search of the residence included in the affidavit for the vehicle search warrant "are tainted and cannot establish probable cause for a further search."[84] He also argues that, "[e]ven assuming arguendo that the house search was valid, the vehicle warrant still lacked probable cause" because it contained insufficient facts connecting Allen's use of the vehicle to drug trafficking.[85] Allen asserts that "[t]he Fifth Circuit requires that affidavits for vehicle searches, like those for homes, articulate why evidence is likely in that vehicle – mere association or ownership is not enough."[86]

The Government responds that, "[i]n order to find that probable cause existed, the magistrate would only need to find that there is a 'fair probability' that the search will reveal evidence of a crime."[87] The Government argues that probable cause was supported by the

---

[83] R. Doc. 52 at 20.
[84] *Id.* at 21 (emphasis omitted).
[85] *Id.* at 21-22 (quote at 21) (emphasis omitted).
[86] *Id.* at 22.
[87] R. Doc. 57 at 8.

information contained in the affidavit, including the tip received by HPD from the unnamed individual on March 20, 2023; the surveillance observations of Allen's residence, including that the Hyundai was present there, on March 20, 2023; the heroin and/or fentanyl found in the residence; information relating to Allen's pending drug charges and an outstanding arrest warrant for distribution of a Schedule I controlled substance; that Allen had been observed driving the Hyundai on prior occasions; that the vehicle smelled of marijuana, and that the occupants admitted to possessing marijuana, during the traffic stop on March 21, 2023; and that Allen's cellphone was believed to be in the vehicle.[88] The Government further argues that the good-faith exception would apply to the search of the Hyundai, as the officers who executed the search relied in good faith on Judge Pickett's March 22, 2023 search warrant.[89]

The affidavit underlying the vehicle search warrant for the Hyundai contained all of the information included in the affidavit for Allen's residence plus information relating to the evidence recovered from Allen's residence, the vehicle and Allen's relationship to it, and the March 21, 2023 traffic stop of the vehicle involving Chambers and Robinson.[90] Because the Court has already determined that both the traffic stop of the pickup truck and the search of Allen's residence were constitutional,[91] Allen's argument that the vehicle search warrant was insufficient because it "was wholly derivative of the prior unlawful searches" must fail.[92] Allen's argument that the affidavit for the vehicle search warrant "lacked a substantial basis for probable cause even on its own terms" by failing to establish a nexus between the Hyundai and suspected drug crimes also fails.[93] While the officers may not have claimed to have seen Allen "use the vehicle to conduct

---

[88] *Id.* at 9.
[89] *Id.* at 10.
[90] R. Doc. 57-1 at 13-14.
[91] *See supra* § II(B)(1)-(2).
[92] R. Doc. 52 at 20.
[93] *Id.*

any drug deals" or received a tip specifically linking the car to drug activity,[94] the affidavit establishes that the car was seen at Allen's residence during the transaction with Dardar but left the residence before the execution of the search warrant.[95]  The affidavit also described Allen's relationship to the car, *i.e.,* that it belonged to Allen's "live in girlfriend" and that he had been observed driving it on several occasions, and that the officers believed that Allen's cellphone was in the vehicle.[96]

Even if the foregoing information were insufficient to establish a nexus between illicit drugs and the vehicle, the affidavit also describes the March 21, 2023 traffic stop of the Hyundai, including that the officers observed the smell of marijuana in the vehicle and that the occupants admitted to being in possession of marijuana,[97] which gave rise to probable cause to search the vehicle.  *See Terrell*, 2024 WL 667690, at *9.  Because, "'for constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant,'" *United States v. Lee*, 465 F. App'x 344, 345 (5th Cir. 2012) (alteration omitted) (quoting *Chambers v. Maroney,* 399 U.S. 42, 52 (1970)), the officers would have been justified in immediately searching the vehicle without a warrant.  However, the officers instead waited to obtain a search warrant for the vehicle.  And because the affidavit for that search warrant includes particularized facts linking Allen to the Hyundai and establishing that the car was present at Allen's residence during the transaction with Dardar, and that there was marijuana in the vehicle when it was stopped, it is not a "bare bones" affidavit, as Allen contends, and Allen does not argue that the

---

[94] *Id.* at 22.
[95] R. Doc. 57-1 at 13.  Allen incorrectly asserts that officers "did not see the car at the site of [Dardar]'s drug pickup."  R. Doc. 52 at 22.
[96] R. Doc. 57-1 at 13.
[97] *Id.* at 14.

good-faith exception is inapplicable as to this search on any other basis.[98]  Thus, even if the affidavit fails to establish "a substantial basis for concluding that a search would uncover evidence of wrongdoing" in the vehicle, *McDaniel*, 293 F. App'x at 268, the good-faith exception applies in any event.

### 4.  Cellphone Search Warrants

Allen also seeks to suppress evidence recovered from his cellphone.  As to the first cellphone warrant, which expired before the TPSO was able to extract any data from the phone, Allen argues that "any search of the phone's data under that lapsed warrant was unauthorized."[99] Allen further argues that, "[e]ven if the phone's data was not accessed until the second warrant came, the lapse of the first warrant raises a concern under the Fourth Amendment's reasonableness and particularity requirements" because "the original basis for probable cause [could have] potentially grown stale" by the time the second warrant was issued.[100]  Allen contends that the second warrant was stale because it was based on an affidavit which "presumably regurgitated the same basis" provided for the first warrant,[101] and "the magistrate should have been presented with any new facts or an explanation" for a second warrant.[102]  Next, "and most critically," Allen argues that both of the cellphone search warrants "were overbroad and executed overbroadly."[103]  He contends that "[t]he warrant affidavits and warrants … sought essentially all data on the phone" – including "call logs, messages, emails, photos, videos, contacts, GPS locations, and more – with no temporal limitation or limitation to those communications about narcotics activity."[104]  He

---

[98] R. Doc. 52 at 22-23.
[99] *Id.* at 23.
[100] *Id.* at 24-25 (emphasis omitted)
[101] *Id.* at 25; *see also* R. Doc. 60 at 5-6 ("[T]he May 9, 2023 phone warrant was mainly predicated on events and facts from March 23, 2023, and earlier ….   The affidavit simply repackaged the same facts from March." (emphasis omitted))
[102] R. Doc. 52 at 26.
[103] *Id.* (emphasis omitted); *see also* R. Doc. 60 at 6-8.
[104] R. Doc. 52 at 27 (emphasis omitted).

further argues "that an overly broad warrant cannot be saved by after-the-fact contention that only some relevant items were used" because "[t]he search itself was a constitutional violation."[105] Allen lastly contends that the warrants included no limiting language and were thus facially overbroad, thereby precluding application of the good-faith exception.[106]

The Government asserts that Allen's arguments regarding the propriety of the cellphone searches are "misplaced."[107]  It argues that the initial cellphone search warrant was supported by "a detailed recitation of the facts surrounding the investigation."[108]  As to the support for the second warrant, the Government contends that the affidavit "not only outlined the entirety of the investigation, but also included information regarding the initial examination of Allen's cellphone following the issuance of the first cellphone warrant," which revealed "several text messages regarding illegal drug transactions."[109]  Therefore, says the Government, "[t]he [second] affidavit clearly demonstrates new information to establish a connection between Allen, narcotics trafficking, and Allen's use of the phone for narcotics trafficking."[110]  The Government again argues that the good-faith exception would apply to the search of the cellphone, as "[n]either of the affidavits for the cellphone search warrants could be considered 'bare bones.'"[111]

As an initial matter, there is no indication that any search of the cell phones was conducted after the expiration of the first warrant but before the execution of the second warrant.  Hunter testified that he personally reviewed the contents of the phone after the first warrant was issued and saw messages relating to illegal drug transactions.  It was only after the phone had been turned over to another officer, who was unsuccessful in his attempts to download its contents, that the

---

[105] *Id.* at 28 (emphasis omitted).
[106] *Id.* at 28-29.
[107] R. Doc. 57 at 11.
[108] *Id.*
[109] *Id.* at 12.
[110] *Id.*
[111] *Id.*

first search warrant expired.  Thus, there is no evidence to be suppressed from any unauthorized search.  While Allen concedes that "the proper procedure when a warrant expires is precisely what happened – get a new warrant," he contends that the second warrant was based on stale information.[112]  This argument is predicated on Allen's false assumption that "[t]he second warrant application presumably regurgitated the same basis" as the first.[113]  In addition to the same facts that were included in the first affidavit,[114] the second affidavit included new information supporting an inference that relevant evidence would be found on the cellphone – namely that "[o]nce the [first] search warrant [for the cellphone] was approved[,] Senior Detective Richard T. Hunter Jr. browsed through Robert Lee Allen's cellular device and observed several text messages[] which were utilized to arrange illegal drug transactions."[115]  The second affidavit also explained that "after several attempts[,] the cellular device flip phone was still unable to be dumped [and] the evidence would have to be removed manually."[116]  Thus, the issuing judge was provided new facts as well as an explanation for the necessity of the second warrant.

Allen's argument that the warrants and searches of the cellphone were overbroad also falls flat.  "[A] warrant is sufficiently tailored – and therefore, not overbroad – when (1) it 'provides sufficient notice' of the particular areas an agent may search, and (2) 'probable cause exists to justify listing' those areas as being subject to search."  *United States v. Song*, 2023 WL 4906646,

---

[112] R. Doc. 52 at 25.

[113] *Id.*

[114] Both the first and second cellphone-warrant affidavits included information related to the tip received from the unnamed individual on March 20, 2023; the events leading up to and evidence recovered during the traffic stop of the pickup, the search of Allen's residence, and the search of the Hyundai; Allen's pending drug charges; and Hunter's statement that, in his "training and experience with illegal narcotics investigations, it is a known fact most higher-level narcotics dealers tend to utilize flip phones to contact and communicate with their source of supply."  R. Doc. 57-1 at 21-24, 30-34 (quote at 23-24, 33).

[115] *Id.* at 33.

[116] *Id.* The affidavit explicitly states that the purpose of the second search warrant was for a manual extraction of the phone's data due to the officers' difficulty in downloading the data within the time provided by the first warrant. *Id.* ("Being that the cellular device was unable to be electronically downloaded, Senior Detective Richard T. Hunter Jr. is requesting another narcotic[s] search warrant, so the evidence observed on the cellular device can be manually removed and placed into evidence.").

at *4 (5th Cir. Aug. 1, 2023) (alteration omitted) (quoting *United States v. Sanjar*, 876 F.3d 725, 735-36 (5th Cir. 2017)).  The second cellphone affidavit sought authorization to "remove any and all text messages, cellular numbers, and photographs pertaining to distribution of illegal narcotics" from Allen's cellphone.[117]   Thus, the second search warrant clearly provided notice of the particular types of data to be searched.[118]   *Cf. id.* at *5 ("[T]he authorization provided specific notice of the types of data [the officer] could search: SMS, MMS, videos, images, calls, and application data related to the [offense].  Even if that authorization was 'somewhat generic,' it nevertheless 'provided sufficient notice of what items' [the officer] could view." (emphasis omitted) (quoting *Sanjar*, 876 F.3d at 736)).

The affidavit also provided sufficient information to establish probable cause.  Hunter stated in the affidavit that, in his "training and experience with illegal narcotics investigations, it is a known fact most higher-level narcotics dealers tend to utilize flip phones to contact and communicate with their source of supply."[119]   The affidavit also noted that the cellphone was found "deeply wedged in between the vehicle passenger seat and center console [and] appeared [to have] been purposely concealed in that position."[120]   To the extent these facts, coupled with the rest of the information in the affidavit linking Allen to drug trafficking, failed to provide "a substantial basis for concluding that a search would uncover evidence of wrongdoing," *McDaniel*, 293 F.

---

[117] *Id.*

[118] Incorporation of the underlying affidavit by reference into a search warrant can supply the requisite description of the property to be searched and the evidence sought.  *See United States v. Allen*, 625 F.3d 830, 836 (5th Cir. 2010) (holding that, where "[t]he warrant at issue [was] undoubtedly broad because of its lack of particularity, … [s]imply incorporating the affidavit and attachments, which stated specifically what the search entailed and what was to be seized, by reference in the warrant could have cured the deficiency of the warrant").

The affidavit for the first cellphone warrant sought authorization to search for "pertinent information []to the distribution and purchasing of illegal narcotics" contained on the phone.  R. Doc. 57-1 at 24.  To the extent that this description, by failing to specify the types of data to be searched, was overbroad, the good-faith exception would apply to Hunter's initial review of the phone's content for the same reasons that it applies to the search conducted pursuant to the second warrant.  *See supra* at p. 26.

[119] R. Doc. 57-1 at 33.

[120] *Id.*

App'x at 268, they nonetheless are sufficient to satisfy the good-faith exception.  *Cf. United States v. Morton*, 46 F.4th 331, 337 (5th Cir. 2022) ("The affidavits used to search [the defendant]'s phones are not of [the bare-bones] genre; they have some meat on the bones.  Each is over three pages and fully details the facts surrounding [the defendant]'s arrest and the discovery of drugs and his phones.  They explain where the marijuana and glass pipe were discovered, the number (16) and location of the ecstasy pills, and the affiant's knowledge that cellphones are used for receipt and delivery of illegal narcotics.  In support of the request to search for photos on the phones, the affiant explains he 'knows through training and experience that criminals often take photographs of co-conspirators as well as illicit drugs and currency derived [from] the sale of illicit drugs.' Whatever one might conclude in hindsight about the strength of the evidence it recounts, the affidavit is not 'wholly conclusory.'" (quoting *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992))).

There is no evidence that the searches exceeded the scope of the authorization.  "With a physical search, an officer executing a search warrant may look anywhere evidence described in the warrant might conceivably be located.  Similarly, in the digital context, a 'search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.'"  *Song*, 2023 WL 4906646, at *4 (internal citation omitted) (first citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982), then quoting *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012)).  Thus, the officers were permitted to search any "messages, cellular numbers, and photographs" stored on the phone to locate the evidence described in the affidavit, *i.e.,* "messages, cellular numbers, and photographs pertaining to distribution of illegal narcotics."[121]  Allen does

---

[121] *Id.*

not argue that the officers removed or searched any data other than the categories identified in the affidavit.  Thus, neither the warrant, nor the search, was overbroad.

### 5. Timing of Residence Search

In his motion to suppress, Allen questions "whether officers secured a valid search warrant before entering and searching Mr. Allen's home at 109 Blair Drive" on March 20, 2023.[122]  He notes that "[t]he state-issued warrant at issue indicates a signature and time of authorization (approximately 8:01p.m. on March 20, 2023)" and asserts that "investigative records suggest law enforcement may have begun searching earlier, possibly even before the warrant was issued."[123]  However, Allen does not identify the "investigative records" he claims indicate that the search began before the warrant was issued, and he does not address this argument in his post-hearing memorandum.  During the suppression hearing, defense counsel questioned Hunter about when the search commenced, and Hunter testified that "nobody entered the residence until the execution of the search warrant" and that "it was nighttime, for sure" when the search was conducted.  The Court finds this testimony to be entirely credible.  Thus, there is no evidence that the search of Allen's residence was conducted prior to the issuance of the search warrant.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Allen's motion to suppress (R. Doc. 52) is DENIED.

---

[122] R. Doc. 52 at 31 (emphasis omitted).
[123] *Id.* (emphasis omitted).

New Orleans, Louisiana, this 7th day of August, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE